## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) THE QUIKTRIP CORPORATION, as Sponsor Administrator, and Fiduciary of the QuikTrip Corporation Retirement Plan, ) ) ) ) Plaintiff, ) v. ) ) (2) SORAYA JAVAHER, Individually and ) as Personal Representative of THE ESTATE ) OF TONY YARBROUGH, deceased; ) (3) L.Y., a minor; ) (4) C.Y., a minor; and ) (5) CHARLOTTE PARKER, ) ) Defendants. ) | Case No. 14-CV-674-JHP-PJC |

## OPINION & ORDER

Before the Court are Defendant Charlotte Parker's Motion for Summary Judgment [Doc. No. 22], Defendant Soraya Javaher's Motion for Summary Judgment [Doc. No. 32], and Plaintiff QuikTrip Corporation's Motion for Discharge, Permanent Injunction, and Attorneys' Fees and Costs [Doc. No. 26]. After consideration of the briefs, and for the reasons stated below, Defendant Parker's Motion is **GRANTED**, Defendant Javaher's Motion is **DENIED**, and Plaintiff's Motion is **GRANTED**.

## BACKGROUND

Tony Yarbrough ("Yarbrough"), an employee of Plaintiff QuikTrip Corporation ("QuikTrip"), held term life insurance policies with Prudential totaling $612,000.00. [Doc. No. 22-1]. In 2006, Yarbrough designated his then-wife, Defendant Soraya Javaher ("Javaher"), to receive 100% of the policy proceeds. [Doc. No. 35-1]. Yarbrough and Javaher later divorced and entered into a Decree of Dissolution of Marriage on November 29, 2011 (the "Divorce

1

Decree"). [Doc. No. 22-3]. The Divorce Decree provided that Yarbrough "shall keep his own life insurance policy and maintain current beneficiaries." [*Id.* at 8].

On September 16, 2014, Yarbrough designated his fiancée, Defendant Charlotte Parker ("Parker") to receive 90% of his life insurance proceeds, and his daughters, Defendants Lillie Yarbrough and C.Y., to receive 5% each of the proceeds. [Doc. No. 22-2]. That same week, Yarbrough designated Parker to receive 90% of his QuikTrip Corporation Retirement Plan ("Retirement Plan") benefits, and Lillie Yarbrough and C.Y. to receive "0.5%" each of the benefits. [Doc. No. 23-1]. Yarbrough died less than three weeks later, on October 2, 2014. [Doc. No. 32-5].

The current remaining death benefit from Yarbrough's life insurance policies is $598,852.76, plus interest, which is currently being held in a Court interest-bearing account. [Doc. No. 28]. The remaining value of the Retirement Plan account is approximately $206,803.17. [Doc. Nos. 2, 26]. The Defendants are agreed that the Beneficiary Designation Form dated September 15, 2014, controls distribution of the Retirement Plan benefits, apart from a scrivener's error that indicates L.Y. and C.Y. should receive ".05%" each of the benefit. [Doc. No. 22, at 5]. The proper distribution of the life insurance benefits, however, remains disputed.

QuikTrip filed this interpleader action on November 10, 2014, as a fiduciary of an employee benefit plan governed by the Employee Retirement Income Security Act ("ERISA"), under 29 U.S.C. § 1132(a)(3). [Doc. No. 2]. QuikTrip seeks a decision from this Court regarding the proper distribution of benefits, as well as an award of its costs and reasonable attorney fees. [*Id.*]. On January 20, 2015, Parker filed a Motion for Summary Judgment, asserting Yarbrough's beneficiary designations should govern the distribution of life insurance benefits. [Doc. Nos. 22]. On January 27, 2015, QuikTrip filed a Motion for Discharge,

Permanent Injunction, and Attorneys' Fees and Costs. [Doc. No. 26]. On February 13, 2015, Javaher filed a cross-Motion for Summary Judgment, asserting the Divorce Decree is a Qualified Domestic Relations Order ("QDRO") under ERISA that preempts Yarbrough's subsequent beneficiary designations with respect to life insurance. [Doc. No. 32]. The pending motions are now fully briefed and ripe for review.

## DISCUSSION

As a general rule, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

### I.     Distribution of the Life Insurance Benefits

All parties agree this case is regulated by ERISA. ERISA preempts "State law" to the extent it relates to an employee benefit plan. 29 U.S.C. § 1144(a) ("[T]he provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ."). Although ERISA defines "State law" subject to preemption to include "all laws, decisions, rules, regulations, or other State

3

action having the effect of law, of any State," 29 U.S.C. § 1144(c), the statute explains that the preemption clause "shall not apply to qualified domestic relations orders (within the meaning of section 1056(d)(3)(B)(i) of this title)." 29 U.S.C. § 1144(b)(7). Under Section 1056(d)(3)(B), a domestic relations order relating to spousal property rights is a QDRO if it "creates or recognizes the existence of an alternate payee's right to . . . receive all or a portion of the benefits payable with respect to a participant under a plan." 29 U.S.C. § 1056(d)(3)(B)(i)(I). To qualify as a QDRO, a domestic relations order must include:

> (i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
> (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,
> (iii) the number of payments or period to which such order applies, and
> (iv) each plan to which such order applies.

29 U.S.C. § 1056(d)(3)(B)(i)(II), (d)(3)(C).[1]  Read together, sections 1144(b)(7) and 1056(d)(3)(B)(i) exempt divorce decrees meeting the QDRO requirements from ERISA preemption. "The general goals of ERISA are served by this interpretation of the preemption exception because a divorce decree meeting the requirements contained in section 1056(d) provides all the necessary information to determine the identity of a beneficiary without creating unreasonable administrative burdens for the plan administrator." *Carland v. Metro. Life Ins. Co.*, 935 F.2d 1114, 1120 (10th Cir. 1991). The QDRO exemption applies to all qualifying domestic relation orders "whether they involve a pension or welfare benefit plan." *Id.*

Thus, the central issue of this case with respect to distribution of Yarbrough's life insurance proceeds is whether the Divorce Decree satisfies the statutory requirements of section 1056(d)(3)(B)(i). With all material facts being undisputed, this case presents a pure question of

---

[1] ERISA also provides three instances in which a domestic relations order is disqualified as a QDRO, none of which are at issue in this case. 29 U.S.C. § 1056(d)(3)(B)(i)(II), (d)(3)(D).

law that is appropriately decided on summary judgment. Parker argues that under controlling Tenth Circuit authority, the Divorce Decree is not sufficiently detailed to meet the QDRO requirement of ERISA, and thus the 2014 beneficiary designation controls. Javaher contends the Divorce Decree "substantially complies" with the statutory requirements, which is sufficient to satisfy the dictates of ERISA.

### A. The Divorce Decree Does Not Qualify as a QDRO

In *Carland*, the Tenth Circuit found that the divorce decree at issue met the requirements of a QDRO:

> Here, the domestic relations order recognizes Beatrice Carland's right to receive policy benefits. The decree denotes the name of the participant, Ralph Carland, and the beneficiary, Beatrice Carland, and provides the names and address of her attorneys. Schedule A specifies that the decree affects the group policy, certificate number 134181. The schedule states Beatrice Carland should receive the "current value" of the policy, less one thousand dollars. Further references to Beatrice Carland as the "irrevocable" and "sole primary beneficiary" indicate her entitlement is based on the value of the group policy at the time of Ralph Carland's death. Because the divorce decree includes all the information required by the statute and does not involve any of the prohibitions, the divorce decree entitling Beatrice Carland to the group policy proceeds, less one thousand dollars, is not preempted by ERISA.

935 F.2d at 1120. By contrast, the Divorce Decree at issue here contains only the statement, "Respondent shall keep his own life insurance policy and maintain current beneficiaries." Neither the policy nor the beneficiary is identified anywhere in the Divorce Decree or any attachments. Javaher is identified, along with her address, on page 7 of the Divorce Decree, but only with respect to "support, visitation, and custody actions," not as a beneficiary of life insurance proceeds. The Divorce Decree is simply too vague (perhaps as the result of poor drafting) to constitute a QDRO under ERISA.

Javaher contends the Divorce Decree should qualify as a QDRO because it substantially complies with the statute's requirements. Javaher relies on *Hawkins v. C.I.R.*, 86 F.3d 982, 991

5

(10th Cir. 1996), in which the Tenth Circuit held a domestic relations order may meet the QDRO requirements if the "criteria of the statute were satisfied in substance," even if the particular divorce decree "failed to track the language of the statute." However, the Tenth Circuit in *Hawkins* went on to reject a liberal reading of the QDRO specificity requirements. *Id.* at 992. "To accept anything less than what [the statute] expressly requires would contravene the Supreme Court's frequent admonition that courts must not read language out of a statute." *Id.* (citing cases).[2] *Hawkins* also rejected a proposal to evaluate the specificity requirements on a case-by-case basis in relation to the subjective knowledge of the plan administrator, because under such a rule "even the most facially inadequate order could theoretically qualify as a QDRO, so long as the plan administrator was aware of the parties' 'true' intentions." *Id.* The *Hawkins* Court did not believe Congress intended that the precise QDRO requirements "could be disregarded in favor of conducting this type of *ad hoc* subjective inquiry." *Id.* Accordingly, the *Hawkins* Court concluded the statutory QDRO requirements "should be accorded [their] plain meaning, and not interpreted so to allow the parties to omit the requested information whenever it is convenient or even perhaps logical to do so." *Id.* at 993.

Javaher also appears to rely on Sixth Circuit authority that takes a relaxed approach to the QDRO requirements, whereby a divorce decree qualifies as a QDRO as long as it "substantially complies" with the requirements of the statute. *See Metro. Life Ins. Co. v. Marsh*, 119 F.3d 415, 422 (6th Cir. 1997). However, the Tenth Circuit expressly rejected this liberal approach, choosing instead to adhere to the actual requirements of the statute. *Hawkins*, 86 F.3d at 992.[3]

---

[2] *Hawkins* addressed the Tax Code's codification of the QDRO requirements, found at 26 U.S.C. § 414(p), which are identical to the QDRO requirements in ERISA.

[3] The Sixth Circuit in *Marsh* followed the Seventh Circuit's liberal approach to the QDRO rules, explained in *Metropolitan Life Insurance Company v. Wheaton*, 42 F.3d 1080 (7th Cir. 1994). *See Marsh*, 119 F.3d at 422. The Tenth Circuit in *Hawkins* specifically rejected the approach taken in *Wheaton*. 86 F.3d at 992 ("While we are mindful of the Seventh Circuit's concerns, we do not agree that the QDRO specificity requirements should be construed this liberally.").

For this reason, Javaher's argument that the Divorce Decree would satisfy the Sixth Circuit's "substantial compliance" standard, as applied in *Metropolitan Life Insurance Company v. Clark*, 159 F. App'x 662 (6th Cir. 2005), is irrelevant. *See id.* at 665 ("The divorce decree clearly qualifies as a QDRO under *Marsh*.").

Javaher argues a ruling in her favor would nonetheless satisfy the dictates of *Hawkins*, because the Divorce Decree does not require the plan administrator to engage in any type of factual analysis to determine who would be the proper beneficiaries. Rather, "[t]he Plan administrator need only take note of the date the divorce decree was entered and pay the beneficiaries of the policy at that time." [Doc. No. 40, at 6]. Javaher's proposal, however, would require the plan administrator to engage in the very kind of "*ad hoc* subjective inquiry" that *Hawkins* rejected. 86 F.3d at 992. Under *Hawkins*, the domestic relations order *itself* must contain the required information to qualify as a QDRO, and the Divorce Decree plainly does not contain this information. Standing alone, the Divorce Decree offers no guidance as to what life insurance policy is being described or who the intended beneficiaries are.[4]

The Divorce Decree does not satisfy any exception to ERISA preemption. As a result, the life insurance funds must be paid in accordance with the beneficiary designation Yarbrough executed on September 16, 2014—90% to Parker and 5% each to Yarbrough's two daughters.[5]

### B.     The Court Declines to Impose a Constructive Trust in Javaher's Favor

Javaher asks that, in the event the Court determines Yarbrough's life insurance proceeds should be paid to Parker, the Court impress the proceeds into a constructive trust with Javaher as

---

[4] The Court notes for the record that *Principal Life Ins. Co. v. Waken*, 2010 WL 5101042 (W.D. Okla. Dec. 8, 2010), upon which Parker relies, does not aid its conclusion on this point. Unlike this case, in *Waken* it was undisputed that the divorce decree was not a QDRO. *Id.* at *2.

[5] Because the Court finds the Divorce Decree is not a QDRO under federal law, the Court need not delve into whether the Divorce Decree's requirement that Yarbrough "keep his own life insurance policy and maintain current beneficiaries" is void under Oklahoma domestic relations law, as Parker urges. [Doc. Nos. 36, 43].

beneficiary.  Javaher argues courts within this Circuit have imposed constructive trusts to protect those who were subject to wrongful conduct.  She cites *Irwin v. Principal Life Insurance Company*, 2005 WL 3470359 (D. Kan. Dec. 16, 2005) in support of her proposal.

*Irwin* involved a dispute between the decedent's estranged widow and his father over life insurance proceeds.  Citing Sixth Circuit law, the *Irwin* court noted, "'[O]nce the benefits have been released to the properly designated beneficiary, the district court has the discretion to impose a constructive trust upon those benefits in accordance with the applicable state law if equity so requires.'"  *Id.* at *12 (quoting *Cent. States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676 (6th Cir. 2000)).  Although the district court concluded the father was the legal recipient of the proceeds under ERISA, the court imposed a constructive trust in the widow's favor for equitable reasons, pursuant to Kansas state law.  *Id.* at *13.

Javaher's reliance on *Irwin* is misplaced, because *Irwin* applied Kansas state law to impose a constructive trust.  Even more damaging to Javaher's argument, Oklahoma state law appears to preclude imposition of a constructive trust in her favor.  In *Carts & Parts, Inc. v. Rosales*, 225 P.3d 1, 4-5 (Okla. Civ. App. 2009), the Oklahoma Court of Civil Appeals found an Oklahoma statute clearly exempted payment of insurance proceeds to an embezzlement victim over the named beneficiary.  The statute at issue, OKLA. STAT. tit. 36, § 3631.1(A)(3), provides all insurance policy benefits shall "[b]e fully exempt from being seized, taken or appropriated or applied by any legal or equitable process or operation of law to pay any debt or liability of the insured or any beneficiary."  These exemptions apply without regard to whether "[t]he power to change the beneficiary is reserved to the insured."  OKLA. STAT. tit. 36, § 3631.1(B)(1).  The *Rosales* court read the statutory term "liability" broadly, to encompass "'all character of debts and obligations'" both within and outside of debtor/creditor relationships. 225 P.3d at 4 (quoting

8

BLACK'S LAW DICTIONARY 473 (5th ed. 1983)). The court further noted "the Legislature did not delineate a constructive trust action as an exception to this exemption," and it declined to "read such an exception into a statute." *Id.* The *Rosales* court also distinguished *Estate of Wellshear*, 142 P.3d 994 (Okla. Civ. App. 2006), upon which Javaher relies in support of imposing constructive trusts, because *Wellshear* did not address the effect of section 3631.1. *Id.* at 5.[6]

Javaher contends *Rosales* and section 3631.1 are inapplicable "because Javaher is not attempting to recover for any type of debt but in essence to ascertan [sic] who should be entitled to the proceeds of an insurance policy." [Doc. No. 35, at 12 n.2]. The Court disagrees. Javaher is seeking imposition of a constructive trust in the event this Court determines the life insurance proceeds should not be paid to Javaher (which the Court has so ruled); in other words, Javaher seeks payment of Yarbrough's "liability" under the Divorce Decree through equitable means. As a result, the Court finds section 3631.1 to be applicable here, and the *Rosales* decision to be persuasive authority regarding interpretation of section 3631.1 by an Oklahoma court. In the present situation, the Court cannot impose a constructive trust in Javaher's favor.

Further, even if a constructive trust were available under Oklahoma law, the Oklahoma Supreme Court has made clear that imposition of a constructive trust requires "some active wrongdoing on the part of the person against whom recovery is sought." *Easterling v. Ferris*, 651 P.2d 677, 680 (Okla. 1982). "[A]n element of unfairness in allowing the legal title holder to retain the property is not sufficient to justify the imposition of a constructive trust." *Id.* Moreover, "the evidence of wrongdoing must be clear, unequivocal and decisive beyond a reasonable doubt." *Id.* at 681 (citing *Cacy v. Cacy*, 619 P.2d 200 (Okla. 1980)). The record

---

[6] *Rosales* also rejected a prior Oklahoma Supreme Court decision that imposed a constructive trust to enjoin the appellant's use of life insurance proceeds acquired partly with embezzled funds—*G&M Motor Co. v. Thompson*, 567 P.2d 80 (Okla. 1977). The *Rosales* court noted the Legislature's enactment of section 3631.1, effective in 1992, effectively superseded *G&M's* holding "and evinced its intent to expand the scope of the statutory exemption for life insurance proceeds to cover all forms of legal and equitable relief." 225 P.3d at 5.

before this Court fails to establish any "active wrongdoing" by Parker. The record also fails to establish beyond a reasonable doubt that Yarbrough engaged in wrongful conduct by naming Parker and his daughters as beneficiaries of the life insurance proceeds. Javaher argues Yarbrough "violated a state court order when he violated the terms of his divorce decree" [Doc. No. 35, at 12], yet Javaher does not present unequivocal evidence that the parties to the Divorce Decree agreed Javaher should be the sole beneficiary of the life insurance proceeds. Javaher's evidence does not satisfy the strict standard for imposing a constructive trust. Accordingly, the Court denies Javaher's request for a constructive trust in her favor.

## II.     Distribution of the Retirement Plan Benefits

All Defendants agree that the Beneficiary Designation Form signed by Yarbrough on September 15, 2014, should determine distribution of the Retirement Plan benefits. [Doc. No. 22, at 5; Doc. No. 35, at 10]. The Defendants request that the Court find the Beneficiary Designation Form contains a scrivener's error: the Form states, apparently in error, that each of his two daughters should receive ".05%" of the benefits. [Doc. No. 23-1 (Beneficiary Designation Form)]. It appears Yarbrough did intend for each of his daughters to receive 5% of the benefits, because a strict adherence to the ".05%" designation would not result in a 100% distribution of the benefits. Accordingly, the Court finds the Beneficiary Designation Form contained a scrivener's error, which shall be corrected so that Parker receives 90% of the Retirement Plan benefits, Lillie Yarbrough receives 5% of the benefits, and C.Y. receives 5% of the benefits.

## III.    QuikTrip's Motion for Discharge, Permanent Injunction, Fees, and Costs

Finally, QuikTrip seeks an order from the Court (1) discharging it from any further liability under the Retirement Plan and or the Retirement Plan proceeds; (2) permanently

enjoining the defendants from instituting or prosecuting any further court proceedings against QuikTrip for the proceeds of the Retirement Plan; and (3) awarding QuikTrip its reasonable attorney fees and costs incurred in initiating and maintaining this interpleader action in the amount of $37,635.79. [Doc. No. 45].

The Defendants do not object to QuikTrip's request for discharge and injunctive relief. Javaher, Lillie Yarbrough, and C.Y. (collectively, the "Javaher Defendants") do not object to QuikTrip's request for fees, but do ask that the apportionment of QuikTrip's fees be taken out of the Retirement Plan funds in a manner that reflects Lillie Yarbrough's and C.Y.'s limited involvement in this matter. [Doc. No. 33]. Specifically, the Javaher Defendants ask that $8,154.12 be taken from the entirety of the Retirement Plan funds, but that the remaining fees and costs be apportioned exclusively to Parker's share of the fund. [*Id.*]. Parker objects to QuikTrip's request for attorney fees in its entirety, and proposes that any fee award should be assessed against the "Javaher share" or should be reimbursed by Javaher. [Doc. No. 34].

"The propriety of the allowance of costs, including a reasonable attorney's fee, to a plaintiff in an interpleader action is well recognized." *United States v. Chapman*, 281 F.2d 862, 870 (10th Cir. 1960). The court retains discretion whether to award attorneys' fees and costs to the stakeholder from the deposited funds. *Melton v. White*, 848 F. Supp. 1513, 1514 (W.D. Okla. 1994). Fees are normally awarded to an interpleader plaintiff who (1) is "disinterested" (i.e., does not claim entitlement to any of the interpleader fund); (2) concedes its liability in full; (3) deposits the disputed fund in court; and (4) seeks discharge and "'is not in some way culpable as regards the subject matter of the interpleader proceeding.'" *Standard Ins. Co. v. Johnson*, 2011 WL 4351629, at *1 (N.D. Okla. Sept. 16, 2011) (quoting *Transamerica Premier Ins. Co. v. Growney*, 70 F.3d 123, 1995 WL 675368, at *1 (10th Cir. 1995) (unpublished)). Here, QuikTrip

(1) is disinterested; (2) concedes the disputed funds are owed in full; (3) has maintained the funds in a 401(k) plan to retain the tax-deferred benefits and has offered to pay the disputed funds into this Court as ordered; and (4) seeks discharge and is not culpable with respect to the subject matter of this proceeding. Thus, it is appropriate and equitable to grant reasonable attorneys' fees and costs from the Retirement Plan fund in QuikTrip's favor.

The Court disagrees with Parker's position that the interpleader was unnecessary. QuikTrip filed this action to resolve the then-active dispute over the Retirement Plan funds efficiently and expeditiously. At that time, QuikTrip was exposed to competing claims for the Retirement Plan funds, with Javaher challenging disbursement of funds to Parker. [*See* Doc. No. 2, Exs. 5, 6]. If anything, Parker has unnecessarily delayed resolution of this particular issue by claiming QuikTrip is entitled to nothing for its efforts in litigating this matter in both state court and this Court. Moreover, it would be inefficient to require QuikTrip to return to the state court to seek its fees incurred in connection with the related probate case. Parker cites to no authority that persuades the Court otherwise. Her self-serving attempt to shame QuikTrip, by suggesting it filed the interpleader only to obtain attorney fees, is not well-taken.

The next step is to determine whether QuikTrip's requested fees are reasonable. The court will generally determine the reasonableness of attorneys' fees by calculating a "lodestar" figure—the total number of hours reasonably expended multiplied by a reasonable hourly rate—and then adjusting the "lodestar" up or down to account for the particularities of the case. *Phelps v. Hamilton*, 120 F.3d 1126, 1131 (10th Cir. 1997). The movant "bears the burden of . . . documenting the appropriate hours expended and hourly rates." *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1201 (10th Cir. 1986) (citation and quotation marks omitted). This burden is met by submitting "meticulous, contemporaneous time records." *Case v. Unified*

*School Dist. No. 233, Johnson Cty., Kansas*, 157 F.3d 1243, 1250 (10th Cir. 1998). Absent unusual circumstances, "the fee rates of the local area should be applied." *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983), *overruled on other grounds by Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 717 n.4 (1987).

In its motion, QuikTrip seeks an award of attorneys' fees in the amount of $36,793.50. In support of the motion, QuikTrip submitted two affidavits of counsel describing his experience and knowledge and an itemized record of billable hours describing the services performed, the dates of such services, and the number of hours expended. These itemized records show QuikTrip incurred $23,431.00 in attorney fees between November 2014 and January 2015. [Doc. No. 26-1]. These records also show QuikTrip incurred $13,362.50 in attorney fees between January 27, 2015, through March 23, 2015. [Doc. No. 45-1].

Having reviewed QuikTrip's counsel's detailed submissions and the background of this matter, the Court finds the hours claimed are neither excessive nor unwarranted and that, as such, QuikTrip is entitled to recover its fees for the hours expended. The Court further finds the hourly rates charged by QuikTrip's counsel and assistants, $50.00 to $340.00 per hour, are reasonable based upon the rates charged by other attorneys in Oklahoma for the same or similar legal services. Accordingly, the Court finds QuikTrip is entitled to an award of attorneys' fees in the amount sought.

QuikTrip also seeks an award of costs in the amount of $810.14. The itemized records show QuikTrip incurred $777.99 in costs between November 2014 and January 2015. [Doc. No. 26-1]. These records also show QuikTrip incurred $32.15 in costs between January 27, 2015, through March 23, 2015. [Doc. No. 45-1]. Having reviewed QuikTrip's counsel's submissions, the Court finds this amount is reasonable. Accordingly, the Court finds QuikTrip is entitled to an

award of $36,793.50 as their attorneys' fees and costs in the amount of $810.14, for a total of $37,603.64. This award reflects a reduction for QuikTrip's double-charging of $32.15 in costs.

Finally, with respect to apportionment of QuikTrip's fees and costs from the Retirement Plan fund, equity demands that Parker bear the greatest share. The record shows the Javaher Defendants did not object to QuikTrip's fees and costs as of January 2015. More specifically, correspondence among the attorneys in this case indicates the Javaher Defendants did not object to QuikTrip's fees and costs as of January 13, 2015, including any additional reasonable fees incurred. [Doc. No. 33-1]. QuikTrip's counsel's invoice dated January 26, 2015, further shows counsel for the Javaher Defendants was in agreement with QuikTrip's revised fee request as of January 19, 2015. [Doc. No. 26-1]. Accordingly, the Court concludes QuikTrip's Motion for Fees and Costs, and subsequent participation by QuikTrip, could have been avoided entirely, had Parker not objected to the assessment of fees against the interpleaded fund. Under these circumstances, it would be inequitable to charge Lillie Yarbrough and C.Y. for fees and costs incurred in a dispute between QuikTrip and Parker. Parker's argument that Javaher should personally bear the fees and costs is entirely without merit, as Parker has failed to show Javaher acted in bad faith in challenging the Beneficiary Designation.

Reviewing QuikTrip's counsel's invoices, the Court finds all fees and costs incurred after January 13, 2015, with several exceptions, should be assessed against Parker's share of the Retirement Plan fund exclusively. Specifically, three line items incurred through January 19, 2015 that reference counsel for the Javaher Defendants should be assessed against the entire fund: (1) January 15, 2015 charge from Mark D. Spencer, 0.30 hours, for "Telephone from Blades re proposed agreed order; method for distributing funds" ($102.00 charge); (2) January 16, 2015 charge from Mark D. Spencer, 0.30 hours, for "Further discussions with Blades re

status and distribution of funds" ($102.00 charge); (3) January 19, 2015 charge from Mark D. Spencer, 0.30 hours, for "Discuss NDOK JSR form with Anna; discuss fees with Blades (in agreement with revised request)" ($102.00 charge). [Doc. No. 26-1]. Additionally, one charge from Anna E. Imose dated January 13, 2015, should be assessed exclusively to Parker's share, because it relates to the attorney fee motion: 2.20 hours for "Draft joint status report and motion for attorney fees" ($363.00 charge). [*Id.*]. The process server fee listed on the January 26, 2015 invoice, for $142.50, should be assessed against the entire fund.

Accordingly, $12,523.74 shall be assessed against the entire Retirement Plan fund, so that 90% is charged to Parker's share of the fund, 5% is charged to Lillie Yarbrough's share of the fund, and 5% is charged to C.Y.'s share of the fund. The remaining $25,079.90 of QuikTrip's award shall be taken out of Parker's share alone, because these fees and costs were incurred exclusively in responding to Parker's objections. Parker's decision to challenge QuikTrip's fee request rather than resolving the matter quickly was made at her peril, as it resulted in QuikTrip's incurring significant additional fees. This results in the following apportionment of QuikTrip's fees and costs: $36,351.26 paid from Parker's share of the Retirement Plan funds; $626.19 paid from Lillie Yarbrough's share; and $626.19 paid from C.Y.'s share.

## CONCLUSION

For the reasons outlined above, the Court concludes Parker's claim for distribution of the life insurance proceeds prevails as a matter of law. Accordingly, Defendant Parker's Motion for Summary Judgment [Doc. No. 22] is **GRANTED** and Defendant Javaher's Motion for Summary Judgment [Doc. No. 32] is **DENIED**.

The Court further concludes QuikTrip should be discharged as a stakeholder and dismissed as a party in this action. QuikTrip is hereby awarded judgment against Defendants on

15

its interpleader action and has no further liability to any other parties in connection with the disputed Retirement Plan funds. Further, Defendants are hereby permanently enjoined from instituting or prosecuting any action in any court affecting Yarbrough's Retirement Plan account other than in this lawsuit. Finally, QuikTrip is awarded $37,603.64 in attorneys' fees and costs to be paid out of the Retirement Plan funds as detailed above. Accordingly, QuikTrip's Motion for Discharge, Permanent Injunction, and Attorneys' Fees and Costs [Doc. No. 26] is **GRANTED**.

James H. Payne
United States District Judge
Northern District of Oklahoma